

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| COURIER SOLUTIONS INC., | § | |
| | § | |
| Plaintiff, Counter Defendant | § | |
| | § | |
| v. | § | Civil Action No. 3:08-cv-2254-N |
| | § | |
| CSA DELIVERY, INC., d/b/a COURIER | § | |
| SOLUTIONS OF AMERICA, INC., | § | |
| WOODROW CLAYTON, SR., WOODROW | § | |
| CLAYTON, JR., DARLENE CLAYTON, | § | |
| ACTION COURIER & LOGISTICS, LLC, | § | |
| NORTH AMERICAN PRESORT, INC., and | § | |
| HOUSTON AREA COURIERS, INC., | § | |
| | § | |
| Defendants/Counter Plaintiff /Third | § | |
| Party Plaintiff | § | |
| | § | |
| Oliver Williams, | § | |
| Tony Young, and | § | |
| Jason Loftis | § | |
| | § | |
| Third Party Defendants | § | |

**FIRST AMENDED JOINT PRETRIAL ORDER**

TO THE HONORABLE DAVID GODBEY, UNITED STATES DISTRICT JUDGE:

Plaintiff Courier Solutions, Inc., and Defendants CSA Delivery, Inc., d/b/a Courier

Solutions of America, Inc., Woodrow Clayton, Sr., Woodrow Clayton, Jr., Darlene Clayton,

Action Courier & Logistics, LLC, North American Presort, Inc., and Houston Area Couriers,

Inc., hereby submit their Pretrial Order.

**A.    A SUMMARY OF THE CLAIMS AND DEFENSES OF EACH PARTY**

**1.    Plaintiff's Summary of the Claims**

Courier Solutions, Inc., is a Texas corporation duly incorporated under the laws of the

State of Texas in 2001.  Its shareholders are Tony Young, Jason Loftis, Oliver Williams, and

Woodrow Clayton, Sr.  CSI was incorporated for the purpose of conducting the business of courier services and delivery, initially in the Dallas area, and was intended to be expanded on a nationwide basis.

When CSI was incorporated, Clayton Sr., represented that he had substantial business to develop for CSI and that he wanted to establish and operate such business as a minority owned enterprise.  Since Clayton Sr., is Caucasian and Tony Young, Jason Loftis, and Oliver Williams are African American, Clayton Sr., needed such additional shareholders in the corporation to qualify the company as a minority owned enterprise.

The business that CSI was initially incorporated to perform had been performed by another minority company.  Unknown to CSI, Clayton Sr. signed a contract in the name of Houston Area Couriers, Inc. ("HAC"), another minority company controlled by Clayton Sr.  He told his business partner with HAC that he would share the profits from such contract with him, and told CSI that the contract was with CSI.

The primary business of CSI was initially located in and around the Dallas/Fort Worth metroplex, but it was at all times intended to operate on a nationwide basis.  To further such purpose, CSI developed a distinctive logo and trademark, and registered such trademark with the United States Trademark Office.

To establish its branding and business reputation, and to advance its overall business, CSI has registered on the Principal Register of the United States Patent and Trademark Office the following trademark: Logo Registration No.2,990,883, registered September 6, 2005, courier services, in Class 39, First Use 2-15-2002, all letters on the logo are blue, the background of the square is gold, with a blue border, Serial No. 76-401-665, filed 4-26-2002.  This registration remains in full force and effect, and CSI has continuously used the trademarked logo in the past

**JOINT PRETRIAL ORDER- Page 2**

and continues to use the trademark and logo in its advertising, correspondence, uniforms, trade dress, and other documents.

From the outset, it was agreed and recognized that Clayton Sr. would be primarily responsible for developing new business for CSI, for the joint benefit of all shareholders, and would provide the financing for startup and expansion of its business. The other three shareholders were to be responsible for setting up the operations of CSI, and its day to day management. Accordingly, business proposals were jointly prepared that listed Clayton Sr. as an officer of the company and submitted to prospective customers, and Clayton Sr. did in fact provide the startup capital for CSI.

The other three shareholders of CSI furnished invaluable assistance in setting up courier business to be performed, or so they thought, by CSI in Florida, and later in California, by locating office space, hiring and training employees, and generally setting up operations. They were not compensated for such services, nor was CSI, since Plaintiff was lead to believe by Clayton Sr. that the business that was being developed was for CSI, and that the profits therefrom would be distributed as part of the profits of CSI. For years, however, they were falsely advised by Clayton Sr. that such business was not being profitable and there was nothing to distribute.

At some time during the development of this business, Defendant Woodrow Clayton, Sr., joined in, and aided and abetted by, the other individual Defendants, began diverting business from CSI to other business entities owned by the Clayton family. Plaintiff has since discovered that what Clayton Sr. was actually doing was to divert corporate opportunities belonging to CSI to other business entities which he owned or controlled, in order to defraud CSI and its minority shareholders, in breach of his fiduciary duties to CSI. In the course of this illegal scheme, he has

**JOINT PRETRIAL ORDER- Page 3**

utilized numerous corporate and other entities, including but not limited to Courier Solutions of America, Inc., CSA Delivery, Inc., d/b/a Courier Solutions of America, Inc., Action Courier & Logistics, LLC, North American Presort, Inc., and Houston Area Couriers, Inc.   Together, all Defendants have conspired with one another to divert the business and corporate opportunities belonging to CSI and to interfere with its existing and prospective business relations and contracts.

The diversion of corporate opportunities included but is not limited to contracts entered into with WAMU, Southwest Airlines, Continental, Wells Fargo, and Amegy Bank, and business in the States of Georgia, Florida, and California.

In the course of carrying out their illegal scheme and course of conduct, Defendants have engaged in unfair competition, including but not limited to the use of deceptively similar advertising materials, theft of the intellectual property rights of Plaintiff, and the making of false and disparaging statements regarding Plaintiff and its minority shareholders, including but not limited to statements falsely stating that Plaintiff was out of business or Plaintiff was unable or unwilling to perform certain services.   The theft of corporate identity practiced by Defendants went to the extent of even taking over leasehold space in San Antonio, Texas, Burbank, Oakland, California, and Pompano, Florida, in order to reinforce the false impression that the business entities owned and operated by Defendants were either the same as, or a continuation of, the business known as CSI.

Further, Clayton Sr., who owed fiduciary duties as a major shareholder, officer, and director, of CSI, breached his fiduciary duties to CSI by diverting substantial business opportunities to other businesses owned by himself and his other family members.   Rather than

developing new business for CSI, which was his primary function, he diverted new business to other entities that he or his family owned, away from CSI.

To facilitate his illegal scheme, Clayton Sr. advised Plaintiff that he would manage the funds generated by other locations of the company, and would be responsible for distributing the profits to the other shareholders of CSI. Plaintiff and its three minority shareholders agreed to such scheme, trusting and relying upon Clayton Sr. to discharge his fiduciary duties faithfully to Plaintiff and to them.

The illegal scheme of Defendants began to unravel when Plaintiff received a large check at the offices of CSI in Dallas, Texas, for additional business other than work performed out of the Dallas office from WAMU. Investigation determined that in fact Defendants had been conducting very substantial business with WAMU through other business entities which was supposed to be for the mutual benefit of the four shareholders of CSI; and not instead diverted to companies owned by only one of the CSI shareholders, namely Clayton Sr.

During the course of its investigation, CSI attempted to obtain information from WAMU. Since WAMU had been corrupted by a bribery scheme created by Clayton Sr., rather than disclosing the true contractual relationship to CSI, WAMU assisted Defendants in covering up the truth about the contractual relations with the parties.

In retaliation for CSI's attempts to obtain redress for the diversion of corporate opportunities, Defendants wilfully and maliciously interfered with existing and prospective business relations of CSI, causing it further damage and ultimately resulting in its cessation of business.

As a direct and proximate result of the foregoing acts, practices and conduct, CSI has been or is likely to be substantially injured in its business, including its reputation, by

**JOINT PRETRIAL ORDER- Page 5**

Defendants' unfair competition, resulting in lost revenue and profits and diminished goodwill and reputation. Further, the loss of revenue caused by the illegal conduct of the Defendants has prevented CSI from developing and expanding its business still further, causing consequential damages.

Plaintiff demands judgment against Defendants, jointly and severally, for its actual and consequential damages caused by their unfair competition.

The foregoing acts, practices and conduct of Defendants have caused and are likely to cause injury to Plaintiff's business reputation and to dilute the distinctive quality of the CSI logo and mark, in violation of the Texas Anti-Dilution Act, Section 16.29 et al of the Texas Business and Commerce Act.

Such acts also constitute a false designation, description or representation, unfair competition, false advertising, fraud, or unfair or deceptive trade practices that are likely to cause confusion and mistake by Plaintiff's customers and the public, and have in fact caused such confusion, in violation of 15 U.S.C. §1125(a).

Plaintiff demands judgment against Defendants, jointly and severally, for its actual and consequential damages caused by their violations of law, trebled as provided for by law.

The above-described actions, practices and conduct of Defendants constitute a use in interstate commerce of a reproduction, counterfeit, copy or colorable imitation of Plaintiff's registered CSI logo and mark, and Defendants' sale, offering for sale, distribution or advertising of goods under the name of "Courier Services" or using the deceptively similar mark is likely to cause confusion or mistake or to deceive the public, and has in fact caused such confusion, in violation of 15 U.S.C. §1114(1).

**JOINT PRETRIAL ORDER- Page 6**

As a direct and proximate result of the foregoing acts, practices and conduct, CSI has been or is likely to be substantially injured in its business, including its reputation, by Defendants' violations of law, resulting in lost revenue and profits and diminished goodwill and reputation.   Further, the loss of revenue caused by the illegal conduct of the Defendants has prevented CSI from developing and expanding its business still further, causing consequential damages.

Plaintiff demands judgment against Defendants, jointly and severally, for its actual and consequential damages caused by their violations of law, trebled as provided for by law.

Since such actions on the part of Defendants were wilful and malicious, Plaintiff further seeks recovery of punitive or exemplary damages from all Defendants, in an amount to be assessed by the fact finder pursuant to applicable provisions of law.

### 3.	Defendant's Summary of the Claims

Woodrow Clayton, Sr. ("Clayton, Sr.") is a nearly 70 year old man who has been in the courier business most of his life.   Both his wife, Darlene, and his son, Woodrow Clayton, Jr. ("Clayton, Jr.") have been active in Clayton, Sr.'s courier businesses, and assisted in all aspects of the business from time to time, including driving, management, and sales.

On September 28, 1990, Clayton, Sr. and A. J. Shepherd, formed Houston Area Couriers ("HAC") to perform courier business in Houston and elsewhere with customers such as Bank United, Fiesta, Foleys, and Southwestern Bell.   One of HAC's largest customers was Bank United who was subsequently purchased by Washington Mutual ("WAMU") in 2001, which created an opportunity for HAC to gain WAMU's business in other locations as well.

In the fall of 2001, Clayton, Sr. WAMU had become dissatisfied with its subcontractor in Dallas.   Further, at that time, Clayton, Jr. was attending college and had a steady girlfriend in Dallas and had expressed an interest to stay in Dallas.

Clayton, Sr. approached Tony Young ("Young"),  Jason Loftis ("Loftis"), and Oliver Williams ("Williams"), who worked for one of HAC's subcontractors, C & D Couriers, Inc., to form a courier business with his son, Clayton, Jr., to take replace HAC's courier subcontractor in Dallas and to pursue other courier business which HAC and/or Clayton, Sr. was not interested in pursuing.   This would allow Clayton, Sr. to be rid of his troublesome Dallas sub contractor, provide his son with a job and ownership in a company, and cement a closer relationship with his Dallas subcontractor.   Clayton, Sr. agreed to provide the start up costs in the form of loans and Young, Loftis, and Williams expressed extreme gratitude for the opportunity to run their own business and they offered to do whatever they could to help Clayton, Sr. his business operations and did so.  From 2001 to 2008, CSA continued to loaned CSI money to operate.

Accordingly, Courier Solutions, Inc.  ("CSI") was formed in Texas in late 2001 and soon took over HAC's courier business sub contracts that HAC had with other Dallas vendors and began doing business in 2002.   CSI also developed a distinctive logo which was ultimately trademarked.  Young, Loftis, Williams, and Clayton, Sr. agreed to market their respective separate businesses under the common name Courier Solutions with the distinctive logo, with CSI selling shirts to CSA and giving CSA written permission to file a dba in Texas with the Courier Solutions name.

In the spring of 2002, Clayton, Sr. formed Courier Solutions of America, Inc., ("CSA") a Nevada corporation, to perform courier business throughout the United States.  Clayton, Sr. with

Young, Loftis, and William's assistance, subsequently secured contracts for CSA with WAMU for Dallas, Georgia, and Florida and sub contracted all of the Dallas work to CSI.

The following year Clayton, Sr., in 2003, formed CSA Delivery, Inc. and North American Presort, Inc, ("NAPS"), both in Texas, to take over Courier Solutions of America, Inc.'s courier business and to do sorting business in California, respectively.  Clayton, Sr. with Young and William's assistance, subsequently secured courier and sorting contracts for CSA and NAPS with WAMU for California.   In 2003, Clayton, Sr. had a series of heart attacks and over the next few years continued to provide all over management and help with sales and customer service for CSA, but became less involved in day to day operations.

In 2007 because Clayton, Sr. wanted less of a role in day to day operations, and to obtain better tax treatment and limited liability than the Clayton's existing corporations, Darlene formed Action Courier & Logistics, LLC, with an eye to bid new contracts and contract renewals in the new business.

From 2003 to 2007 CSA, NAPS, and CSI all worked together and prospered.  In 2007, HAC did over $4,000,000.00 of business, CSA and NAPS, over $11,000,000.00 of business and CSI, over $3,000,000.00 of business.   WAMU was by far each company's largest customer, with HAC, CSA, and CSI performing and collecting for courier services in Houston, California and Florida, and Dallas, respectively.   The companies all worked together with CSA and CSI using the same logos, and assisted each other to secure and promote business in their respective markets.

In early 2008, CSI lost its second largest customer, Bank of America, worth nearly $1,000,000 annually, due to delivery problems.   These delivery problems also resulted in cancellation of the Houston contract belonging to Defendants which was of a similar size.

**JOINT PRETRIAL ORDER- Page 9**

Then in February of 2008, with CSI having lost nearly 1/3 of its business, WAMU mistakenly sent a check to CSI for $614,241.50 to pay for work done in done in Dallas, Florida, and California, in the amounts of $83,617.32, $184,133.65, and $346,490.53 respectively and CSI cashed it.    Previously and thereafter, WAMU sent checks for courier or sorting work performed in Dallas to CSI, in Houston to HAC, and in Florida and California to CSI.

In March Clayton, Sr. requested return of the amounts applicable to Florida and California, but CSI breached its sub contract with CSI and declined, converting the funds intended to pay for work done in Florida and California to their own use, saying part of the money belonged to them, claiming that they owned part of the Florida and California operations. CSI, Young, Loftis, and Williams had helped set up the Florida and California operations and were aware of their operations for more than 5 years but never made any requests for an accounting, let alone a share of the profits.

Over the next four months CSA and CSI's once harmonious relationship declined.   CSI instructed CSA to stop using their name and logo and requested an accounting.    CSI fired Clayton, Jr.   CSI insisted Clayton, Sr. was a alternately a shareholder, director, officer, or employee of CSI and owed CSI fiduciary duties.   However, CSI's own minute book, corporate tax returns, public information reports, and payroll records indicate clearly he was not. Next CSI began arguing that CSI owned 75% of HAC, CSA, NAP, and ACT and that Clayton, Sr. told them he intended to give them 75% of everything he owned or would ever own in the courier business when he approached them about forming CSI.   Again Clayton, Sr. advised them he had never done any such thing and such demand was in contrast to the parties' actions the 5 years past.

When that didn't work, CSI tortiously interfered with the Defendants' contracts with WAMU and flew out to WAMU's corporate offices in Washington state without an appointment, and demanded to speak to representatives in WAMU's minority business segment, fraudulently and maliciously claiming the contract for courier services performed in Texas, Florida, and California belonged to them.

When that didn't work, CSI embarked upon a course of action involving further tortious interference, fraud, malice, and extortion, and engaged Royce West, a prominent Dallas, Texas state senator and attorney, who contacted Tom Leppert, the mayor of Dallas who was then a WAMU board member, who then opened an investigation into CSI's charges that Woody, Sr. and/or others defrauded WAMU by holding themselves out as a minority contractor, that the contracts for the WAMU work done in Houston, Dallas, Georgia, Florida, and California all belonged to CSI, and worst of all, that Woody, Sr. and CSA were bribing a WAMU official, ironically, when the majority of the alleged bribe checks came from CSI.

At this point, it was apparent the relationship between the parties had broken down beyond all repair, so CSA terminated all of its sub contracts with CSI beginning in July over the next two or three months and sued CSI in July of 2008 in the Harris County, Texas courts, for recovery of the $529,624.18 of the $614,241.50 check that didn't belong to CSI, for defamation, and for tortious interference with contract as it related to their actions with WAMU, among other things.

Ironically  6 months after CSA sued CSI, in a forum shopping coup, CSI filed suit in a, against CSA in Federal court in Dallas in this case, alleging common law unfair competition, Texas Anti Dilution Act, Lanham Act (Unfair Competition), Lanham Act (Trademark Infringement), breach of fiduciary duty, and tortious interference with existing or prospective

**JOINT PRETRIAL ORDER- Page 11**

contracts. Another 8 months later, CSI filed essentially the same claims in the state court case in Harris County.

Further, in its common law unfair competition, Texas Anti Dilution Act, Lanham Act (Unfair Competition), Lanham Act (Trademark Infringement) counts, CSI is claiming the Defendants improperly used the very name or names CSI gave them written permission to use and allowed them to use without complaint for more than 5 years, setting up defenses for the Defendants of statute of limitations, acquiescence, license, waiver, laches, and promissory estoppel

Additionally, in its common law unfair competition, Texas Anti Dilution Act, Lanham Act (Unfair Competition), Lanham Act (Trademark Infringement) counts, CSI is claiming the Defendants improperly used the CSI logo which were prominently emblazoned on the shirts CSI sold to CSA by CSI for more than 4 years setting up defenses for the Defendants of statute of limitations, acquiescence, payment, license, waiver, laches, and promissory estoppel.

Further, in its common law unfair competition, Lanham Act (Unfair Competition), counts, CSI is claiming the Defendants somehow improperly confused the customers and/or the public by marketing its goods and services using the CSI name and/or logo and/or minority certification and/or other unknown items, when CSA was using the names and logos and minority certification with CSI's full knowledge, consent and assistance, once again setting up defenses for the Defendants of statute of limitations, acquiescence, payment, license, waiver, laches, and promissory estoppel

Additionally, in its breach of fiduciary duty claims, CSI has insisted Clayton, Sr. owed CSI fiduciary duties because he was alternately a shareholder, director, officer, or employee of CSI and owed CSI fiduciary duties, but CSI's own minute book, corporate tax returns, public

**JOINT PRETRIAL ORDER- Page 12**

information reports, and payroll records indicate clearly he was none of these. Further, Clayton, Sr. pursued contracts on behalf of HAC, CSA, and NAP for more that 5 years with CSI's full knowledge and assistance without complaint, once again setting up defenses of statute of limitations, acquiescence, license, waiver, laches, and promissory estoppels. Further, CSI continuously borrowed money from CSA during its 6 year relationship and did not have the funds to pursue the WAMU Georgia, Florida, and California projects on its own.

Because of CSI, Young, Loftis, and Williams' actions and tortuous interference with Defendants' WAMU, contracts that Defendants's had serviced for years, all of Defendants' WAMU contracts were terminated:  Georgia 1/31/09, Dallas 2/28/09, Houston 7/31/09, and for California and Florida 7/31/10.Ultimately the parties decided to try this case in federal court rather than state court in part because it came to trial first there and the parties agreed judicial economy would be served by having all claims tried at once.

## B.    A STATEMENT OF STIPULATED FACTS

Houston Area Couriers, Inc. ("HAC") is a Texas corporation duly incorporated under the laws of the State of Texas in 1990.  Its shareholders are Woodrow Clayton, Sr. and A. J. Shepherd.  HAC was incorporated for the purpose of conducting the business of courier services and delivery.  HAC was qualified as a minority owned enterprise due to Shepherd's ownership interest.

Courier Solutions, Inc. ("CSI"), is a Texas corporation duly incorporated under the laws of the State of Texas in 2001.  CSI was incorporated for the purpose of conducting the business of courier services and delivery.

When CSI was incorporated, Clayton Sr., represented that he had substantial business to develop for CSI and that he wanted to establish and operate CSI as a minority owned enterprise.

Tony Young, Jason Loftis, and Oliver Williams are African American, and their 75% ownership of CSI qualified the company as a minority owned enterprise.

To expand the business for the parties' mutual benefit, Clayton, Sr., Loftis, Young, and Williams participated in securing new courier contracts in Dallas, Florida, Georgia in 2002 and California in 2003. They all worked together to develop the infrastructure for the business in several states to service the needs of WAMU nationally.

The business of CSI, from the outset, was designed to include not only standard courier and messenger service, but also shipments via air to other cities, and mail and package presorting services.

The primary business of CSI was initially located in and around the Dallas/Fort Worth metroplex, but it was at all times intended to operate on a nationwide basis. To further such purpose, CSI developed a distinctive logo and trademark, and registered such trademark with the United States Trademark Office.

To establish its branding and business reputation, and to advance its overall business, CSI has registered on the Principal Register of the United States Patent and Trademark Office the following trademark: Logo Registration No.2,990,883, registered September 6, 2005, courier services, in Class 39, First Use 2-15-2002, all letters on the logo are blue, the background of the square is gold, with a blue border, Serial No. 76-401-665, filed 4-26-2002. This registration remains in full force and effect, and CSI has continuously used the trademarked logo in the past and continues to use the trademark and logo in its advertising, correspondence, uniforms, trade dress, and other documents.

Plaintiff and its officers and affiliates have continuously used the trademarked logo and mark in interstate commerce in connection with the promotion and operation of the business of

**JOINT PRETRIAL ORDER- Page 14**

Courier Solutions, Inc.  Plaintiff has promoted and advertised its courier and delivery services utilizing the trademarked logo through various media throughout the State of Texas and elsewhere in the United States featuring the trademarked logo prominently.

As is apparent from the logo and mark, it pictures a runner whose body is actually made up by the letters "C S I" in a stylized manner.

CSA Delivery, Inc. (also "CSA") is a Texas corporation duly incorporated under the laws of the State of Texas in 2003.  CSA is owned by Clayton, Sr. and Darlene.  CSA was incorporated for the purpose of conducting the business of courier services and delivery.

North American Presort, Inc. ("NAP") is a Texas corporation duly incorporated under the laws of the State of Texas in 2003.  NAP is owned by Clayton, Sr. and Darlene.  NAP was incorporated for the purpose of conducting the business of mail and document sorting.

Action Courier & Logistics, LLC ("ACT") is a Texas limited liability company duly incorporated under the laws of the State of Texas in 2007.  ACT is owned by Darlene.  ACT was incorporated for the purpose of conducting the business of courier services and delivery.

From 2003 to 2008, CSI, pursuant to instructions from Clayton Sr.,  made payments to Jill McMeans, the wife of Nigel Simpson ("Simpson"), a WAMU purchasing agent, or SS & DD, Inc., a company owned by McMeans.

In February of 2008, WAMU mistakenly sent a check to CSI for $614,241.50 to pay for work done in Dallas, Florida, and California, in the amounts of $83,617.32, $184,133.65, and $346,490.53 respectively

On December 22, 2008, CSI sued CSA and the other Defendants in federal court in Dallas, Texas in this suit.

**JOINT PRETRIAL ORDER- Page 15**

The name Woodrow Clayton appears in CSI's minute books as a shareholder, but such entries do not distinguish between Sr. or Jr.

All S corporation federal income tax returns of CSI name Woodrow Clayton as a shareholder, but such entries do not distinguish between Sr. or Jr.

## C.    A LIST OF CONTESTED ISSUES OF FACT

Whether Clayton Sr. was one of the four shareholders of CSI.

Whether Clayton Sr. agreed and represented that he was primarily responsible for development of new business for CSI.

Whether together Clayton, Sr., Young, Loftis, and Williams prepared responses to Requests for Proposals to submit to WAMU for additional business in additional states, representing that the business was for CSI, and that Woody Clayton was an officer and representative of CSI involved in developing its business.

In whose name was the initial contract with WAMU made, and for whose benefit?

Whether in 2006, another contract for CSI  or CSA was successfully negotiated with WAMU.

Whether Young, Loftis, and Williams believed that Clayton Sr. was representing CSI in the negotiations with WAMU, and whether Clayton Sr. so represented he was representing CSI to Young, Loftis, and Williams and/or WAMU.

Whether Young, Loftis, and Williams reasonably believed that Clayton Sr. was representing CSI in the negotiations with WAMU, both initially and later with respect to new business in Florida, Georgia, and California.

Whether and when if ever, Clayton Sr. informed Young, Loftis, and Williams that any WAMU contract was actually with another corporation Clayton Sr. formed, named CSA Delivery, Inc. ("CSA").

Whether Clayton Sr. had any duty to inform CSI, Young, Loftis, and Williams that the WAMU contract was actually with another corporation he formed, named CSA Delivery, Inc. ("CSA").

Whether Clayton Sr. also informed Young, Loftis, and Williams that he could get more business for them if they signed an agreement giving him specific permission to use the name, "Courier Solutions of America", and they gave him permission, based upon the express agreement and understanding that the contract was to benefit CSI.

Whether at some time during the development of this business, Woodrow Clayton, Sr., joined in, and aided and abetted by, one or more of the other Defendants, began diverting business from CSI to other business entities owned by the Clayton family.

Whether at some time during the development of this business, CSI, Young, Loftis, and Williams, joined in, and assisted one or more of the other individual Defendants in establishing business that they now claim was diverted from CSI to other business entities owned by the Clayton family.

Whether and when CSI, Young, Loftis, and Williams knew that the Defendants were doing business in Houston, Georgia, Florida, and California without sharing the profits of such business with CSI from 2002 to 2008.

Whether Clayton Sr. repeatedly represented to Young, Loftis, and Williams that the new business being developed in Georgia, Florida, and California was not profitable, and that the payment of profits to them as a part of the CSI profits was "a grey area."

**JOINT PRETRIAL ORDER- Page 17**

Whether CSI Young, Loftis, and Williams acquiesced that the Defendants were doing courier business in Houston, Georgia, Florida, and California without sharing the profits of such business with CSI.

Whether CSI, Young, Loftis, and Williams ever made any demand before June 10, 2008 for an accounting or share of profits from the Defendants' courier operations or that the Defendants stop using their name or logo.

Whether what Clayton Sr. was actually doing was to divert corporate opportunities belonging to CSI to other business entities which he owned or controlled, in order to defraud CSI and Young, Loftis, and Williams, in breach of his alleged fiduciary duties, if any, to CSI.

Whether Clayton Sr. had fiduciary duties to Plaintiff and Young, Loftis, and Williams, and whether he breached such duties.

Whether Clayton Sr. committed any acts which would place him in a fiduciary position with respect to CSI such that he could not pursue courier business on his own.

Whether, in the course of the alleged illegal scheme described by Plaintiff above, Clayton Sr. has utilized numerous corporate and other entities, including but not limited to CSA Delivery, Inc., d/b/a Courier Solutions of America, Inc., Action Courier & Logistics, LLC, North American Presort, Inc., and Houston Area Couriers, Inc., and has utilized the assistance of Darlene Clayton and Clayton Jr.

Whether one or more of the Defendants have conspired with one another to divert the business and corporate opportunities belonging to CSI and to interfere with its existing and prospective business relations and contracts.

Whether in carrying out such alleged diversion of corporate opportunities, one or more of the Defendants acted jointly and pursuant to a civil conspiracy for their mutual economic benefit.

**JOINT PRETRIAL ORDER- Page 18**

Whether the alleged diversion of corporate opportunities includes but is not limited to contracts entered into with WAMU in the States of Georgia, Florida, and California.

Whether in the course of carrying out Defendants' alleged illegal scheme and course of conduct, one or more of the Defendants have engaged in unfair competition, including but not limited to the use of deceptively similar advertising materials, theft of the intellectual property rights of Plaintiff, and the making of false and disparaging statements regarding Plaintiff and CSI and Young, Loftis, and Williams, including but not limited to statements falsely stating that Plaintiff was out of business or Plaintiff was unable or unwilling to perform certain services.

Whether Defendants obtained permission to use the CSI trademark and logo through false representations and promises.

Whether the alleged theft of corporate identity practiced by one or more of the Defendants went to the extent of even taking over leasehold space in San Antonio, Texas, Burbank, Oakland, California, and Pompano, Florida, in order to reinforce the false impression that the business entities owned and operated by one or more of the Defendants were either the same as, or a continuation of, the business known as CSI.

Whether one or more of the Defendants have engaged in a course of conduct and pattern and practice designed to infringe, and with the effect of infringing, upon the trademark and intellectual property rights of the Plaintiff, through the advertising and business activities of CSA Delivery, Inc., d/b/a Courier Solutions of America, Inc., Action Courier & Logistics, LLC, North Texas Presort, Inc., and Houston Area Couriers, Inc.

Whether notwithstanding the long and well established use of the CSI logo and mark by Plaintiff, one or more of the Defendants, acting in concert and combination with one another, have adopted and used in commerce a deceptively similar logo, whereby all that one or more of

**JOINT PRETRIAL ORDER- Page 19**

the Defendants have done is to change the color scheme utilized, but they have retained the identical form of a runner whose body is made up of the letters "C S I." Plaintiff was the first to use such mark in commerce, and is the owner of such registered mark, and the fact that the letters comprising the figure are the letters CSI and not CSA is an indisputable fact establishing the infringement being practiced by Defendants.

Whether in utilizing such allegedly infringing such logo and mark, one or more of the Defendants have used, advertised, and promoted the same and engaged in activities to market and promote their courier and delivery services and have purposefully diverted and directed customers of Plaintiff away from Plaintiff to utilize the courier and delivery services of the corporate Defendants. This has included usage of the uniforms developed for CSI which have its distinctive logo and design, as well as the logo and mark.

Whether at all material times, one or more of the Defendants have had actual knowledge that their use of the infringing logo and mark is likely to cause confusion with the CSI logo and mark, and, despite the demands of Plaintiff, have failed and refused to cease and desist from such infringement.

Whether one or more of the Defendants have designed their infringing logo and trademark and advertised the same, in a manner which is likely to lead consumers to believe that the one or more of the Defendants and their businesses are affiliated with, franchised by, related to, or sponsored by Plaintiff.

Whether one or more of the Defendants' use of the alleged infringing logo and mark are likely to result in consumer confusion, and have in fact resulted in consumer confusion, as well as a misappropriation of the commercial benefits, consumer recognition and goodwill associated with the CSI logo and mark.

**JOINT PRETRIAL ORDER- Page 20**

Whether CSI, Young, Loftis, and Williams gave the Defendant's permission to use their logo and mark, and whether such permission, if obtained, was obtained through false pretenses.

Whether Defendants stopped all use of CSI's logo and mark as soon as possible after receipt of the demand letter of June 10, 2008.

Whether in addition to the likelihood of confusion created by one or more of the Defendants alleged infringing use of the infringing logo and mark, such use has already caused a number of instances of actual confusion in which WAMU seeking courier and delivery services have engaged the services of one or more of the Defendants under the mistaken belief that they were affiliated with CSI.

Whether one or more of the Defendants' use of the alleged infringing logo and mark in an manner that is confusingly similar to that of Plaintiff's CSI logo and mark has been wilful and deliberate , and whether one or more of the Defendants or all of them are jointly and severally responsible for such wilful, deliberate, and illegal acts.

Whether the alleged foregoing acts, practices and conduct by one or more of the Defendants are likely to destroy the exclusive source identity that the CSI logo and mark has developed in the minds of consumers, thereby diverting business away from CSI and resulting in lost revenue and profits, diminished goodwill, and loss of control by Plaintiff of the reputation and character of its distinctive CSI logo and mark.

Whether the alleged illegal scheme of Defendants began to unravel when Plaintiff received a large check for additional business other than work performed out of the Dallas office from WAMU.

**JOINT PRETRIAL ORDER- Page 21**

Whether CSI, Loftis, Young, and Williams had any right to retain those portions of the large check received from WAMU in February 2008 related to work performed in Florida and California.

Whether investigation by Plaintiff determined that in fact Defendants had been conducting very substantial business with WAMU through other business entities which was supposed to be for the mutual benefit of CSI; and not instead diverted to companies owned by Clayton Sr.

Whether WAMU changed the names of the contracting parties in 2008 when Plaintiff began its investigation.

Whether WAMU had been corrupted by a bribery scheme created by Clayton Sr..

Whether since CSI made the majority of the alleged bribery payments for a number of years, CSI, Loftis, Young, and Williams knew what they were for and agreed with their purpose.

Whether CSI's actions in claiming the WAMU contract was theirs and by making allegations that CSA had improperly used their minority certification and was bribing WAMU officials, CSI breached its subcontract with CSA, tortiously interfered with Defendants' contracts with WAMU.

Whether rather than disclosing the true contractual relationship to CSI, WAMU assisted one or more of the Defendants in covering up the truth about the contractual relations with the parties.

Whether in retaliation for CSI's attempts to obtain redress for the alleged diversion of corporate opportunities, one or more of the Defendants wilfully and maliciously interfered with existing and prospective business relations of CSI, causing it further damage and ultimately resulting in its cessation of business.

**JOINT PRETRIAL ORDER- Page 22**

Whether as a direct and proximate result of one or more of the Defendants' foregoing alleged acts, practices and conduct, CSI has been or is likely to be substantially injured in its business, including its reputation, by one or more of the Defendants' alleged violations of such Act, resulting in lost revenue and profits and diminished goodwill and reputation.

Whether such loss of revenue caused by the alleged illegal conduct of the Defendants has prevented CSI from developing and expanding its business still further, causing consequential damages.

Whether the above-described actions, practices and conduct of one or more of the Defendants constitute a use in interstate commerce of a reproduction, counterfeit, copy or colorable imitation of Plaintiff's registered CSI logo and mark, and one or more of the Defendants' sale, offering for sale, distribution or advertising of goods under the name of "Courier Services" or using the deceptively similar mark is likely to cause confusion or mistake or to deceive the public, and has in fact caused such confusion, in violation of 15 U.S.C. §1114(1).

Whether at all material times, Clayton Sr. was a fiduciary with respect to Plaintiff, as a Director, 25% shareholder, and founder of the corporation engaged in a joint enterprise with the other three shareholders to develop and expand the business of CSI and if so, as such, he owed the highest duty of care and loyalty to CSI.

Whether Clayton Sr., was both a 25% shareholder of CSI and a Director of such company.

Whether one or more of the Defendants have engaged in a course of conduct and pattern and practice designed to infringe, and with the effect of infringing, upon the trademark and intellectual property rights of the Plaintiff, through the advertising and business activities of CSA

**JOINT PRETRIAL ORDER- Page 23**

Delivery, Inc., d/b/a Courier Solutions of America, Inc., Action Courier & Logistics, LLC, North Texas Presort, Inc., and Houston Area Couriers, Inc.

Whether the agreement among the Clayton, Sr., Young, Loftis, and Williams was that they would together develop and expand the business of Plaintiff for their mutual economic benefit and whether Clayton Sr.'s specific responsibility, as agreed upon between the shareholders, was to develop the business of CSI.

Whether Clayton Sr, rather than fulfilling his alleged fiduciary duties owed to Plaintiff and its shareholders, instead engaged in a course of conduct designed to misappropriate and convert to the use and benefit of one or more of the Defendants, the intellectual property and trade name of Plaintiff, as well as its trademark rights.

Whether on numerous occasions, Clayton Sr. became aware of business opportunities and prospective business arrangements which constituted valuable corporate opportunities for Plaintiff, but, in violation of his alleged fiduciary duties, diverted such business opportunities to other business entities owned and controlled by members of his family.

Whether the extent of the alleged diversion of corporate opportunities also included tortious interference with existing contractual arrangements of Plaintiff as well as diversion of prospective contracts or expansions of existing contracts.

Whether Clayton, Sr., Young, Loftis, and Williams expressly agreed that they would jointly develop and increase the business of CSI, and formed a joint venture and enterprise for such purpose.

Whether Clayton, Sr. was in a position of fiduciary responsibility, and if so, whether Clayton Sr. had a fiduciary duty to develop the business opportunities for the exclusive benefit of

Plaintiff and whether instead, he wilfully diverted numerous highly lucrative business opportunities to other business entities, including the corporate Defendants.

Whether during the course of their alleged illegal scheme and course of conduct, one or more of the Defendants engaged in numerous acts of deliberate consumer confusion and business disparagement, representing that CSA and other business entities owned and controlled by one or more of the individual Defendants were minority enterprises, when in fact they were not, and representing that Plaintiff is no longer in business and that their companies are the successors to CSI.

Whether one or more of the Defendants have further orchestrated and directed a course of conduct utilizing bribery of contracting officials with one or more of the customers with whom Plaintiff was doing business, by directing payments to be made to a "consulting" company actually owned and controlled by a corporate representative of WAMU, in order to obtain favorable treatments and assignment of contracts to whatever business entities that one or more of the Defendants wished to utilize at any given time.

Whether the extent of one or more of the Defendants' alleged misappropriation of intellectual property rights and goodwill has included not only use of Plaintiff's trademarked logo, uniforms, and trade dress, but also diversion of business opportunities belonging to the corporation, and theft of Plaintiff's customers, valuable business contacts, and even insurance policies purchased by Plaintiff.

Whether the acts, practices and conduct of one or more of the Defendants constitute unfair competition under common law and are likely to confuse and mislead the public into believing that one or more of the Defendants are associated with or related to CSI, and have in fact caused such confusion, thereby diverting business away from CSI, or otherwise benefitting

**JOINT PRETRIAL ORDER- Page 25**

one or more of the Defendants from the goodwill and reputation associated with the CSI logo and mark.

Whether Plaintiff is entitled to the profits earned by one or more of the Defendants from such alleged wrongful acts and course of conduct.

Whether one or more of the Defendants have tortiously, maliciously, and without lawful justification or purpose, interfered with such existing contractual relations, proximately causing damages to Plaintiff.

Whether Plaintiff also possessed prospective business opportunities to conduct business with various companies and customers in several states, and was reasonably likely to develop existing contractual relations with such customers.

Whether one or more of the Defendants have tortiously and maliciously interfered with such prospective economic advantage, without lawful privilege or justification, and prevented Plaintiff from obtaining existing contracts and business relations with such customers, causing still further damages to Plaintiff.

Whether such actions on the part of one or more of the Defendants were wilful and malicious, entitling Plaintiff to recovery of punitive or exemplary damages from one or more of the Defendants, in an amount to be assessed by the fact finder pursuant to applicable provisions of law.

Whether CSI utilizes the trademarked logo as a means of distinguishing its services and courier and delivery services from those offered by its competitors.

Whether Plaintiff has invested substantial resources, labor, and effort in promoting and advertising its courier and delivery services offered and sold utilizing the CSI logo and mark for an extended period of time, in interstate commerce, throughout the United States. The courier

and delivery services offered by Plaintiff have met with widespread public approval and acceptance and account for the substantial success of CSI as well as the acceptance and popularity of its courier and delivery services.

Whether as a result of Plaintiff's reputation for quality and the sales and promotional efforts of Plaintiff, the CSI logo and mark has earned significant goodwill such that the CSI logo and mark have come to indicate to the buying public and are understood by customers to mean the services of Courier Solutions, Inc.

Whether the CSI logo and mark as applied to courier and delivery services as offered by Plaintiff, have become distinctive and have achieved "secondary meaning" and are associated in the minds of consumers with Plaintiffs.

Whether CSI and Defendants agreed to market their respective separate businesses under the common name Courier Solutions with CSI distinctive logo.

Whether the services of CSI and Defendants are not provided in the same geographical area?

Whether CSI authorized one or more of the Defendants to use its name, trademarked logo, HUB certification, and other assets to secure and service business.

Whether CSI was compensated by one or more of the Defendants for use of its trademark.

Whether CSI had a contract with Washington Mutual?

Whether amounts paid to Jill McMeans and SS & DD, Inc. were bribes or payments for consulting to break into the pharmacy industry.

Whether Defendants bribed contracting officials with one or more of CSI's customers, in order to obtain favorable treatment and assignment of contracts?

**JOINT PRETRIAL ORDER- Page 27**

Whether Young, Loftis, or Williams' efforts were a significant factor in negotiating or securing any contract.

Whether CSI or Young, Loftis, or Williams had sufficient funds to pursue the WAMU contracts for Georgia, Florida, and California without Clayton, Sr.

Whether it was at all times agreed and understood between the parties that Clayton Sr. was to provide the financing necessary for CSI.

Whether it was at all times agreed and understood between the parties that Clayton Sr. was to provide unlimited financing necessary for CSI.

Whether CSI failed to provide appropriate courier services to Defendants' customers in the Dallas area, which adversely reflected on Defendants and their relations with their customers

Whether the loss of the Bank of America contract was CSI's fault.

Whether the Defendants lost their contracts with WAMU because of CSI's actions.

Whether CSI has suffered damages.

Whether CSI is entitled to recover reasonable attorney fees from Defendants, and if so, what amount of attorney fees is reasonable and necessary.

Whether Defendants have suffered damages.

Whether Defendants are entitled to reasonable attorney fee because of CSI's actions, and if so, what amount of attorney fees incurred by the Defendants is reasonable.

What the Calculation of damages for CSI is.

What the calculation of damages for Defendants is.

Whether CSI's actions resulted in the loss of the Defendants business with WAMU.

Whether one or more of the Defendants actions cost CSI business with WAMU.

Whether Clayton, Sr. promised to give up 75% of all of the courier business he had or would ever have to Jason, Tony, and Oliver.

Whether Woodrow Clayton, Sr. ("Clayton, Sr.") has been in the courier business most of his nearly 70 years.

Whether both his wife, Darlene, and his son, Woodrow Clayton, Jr. ("Clayton, Jr.") have been active in Clayton, Sr.'s courier businesses, and assisted in all aspects of the business from time to time, including driving, management, and sales.

Whether in 2001, HAC had contracts in Houston, Dallas, and elsewhere with Bank United (who was bought out that same year by Washington Mutual ["WAMU"]), Fiesta, Foleys, and Southwestern Bell.

Whether in the fall of 2001, Clayton, Sr. became dissatisfied with HAC's subcontractor in Dallas.  Further, at that time, Clayton, Jr. was attending college and had a steady girlfriend in Dallas and had expressed an interest to stay in Dallas.

Whether Clayton, Sr. approached Tony Young ("Young"),  Jason Loftis ("Loftis"), and Oliver Williams ("Williams"), who worked for one of HAC's competitors, C & D Couriers, Inc., to form a courier business to take replace HAC's courier subcontractor in Dallas and to pursue other courier business.

Whether Clayton, Sr. agreed to provide the start up costs for the new venture in the form of loans.  Young, Loftis, and Williams expressed gratitude for the opportunity to run their own business and they offered to do whatever they could to help grow the businesses.

Whether in 2002, HAC gave CSI its Dallas sub contracts for Fiesta, Foleys, and Southwestern Bell.

Whether Courier Solutions of America, Inc., ("CSA") was a Nevada corporation duly incorporated under the laws of the State of Nevada in 2002.  CSA was owned by Clayton, Sr. and Darlene.  Whether CSA was incorporated for the purpose of conducting the business of courier services and delivery.

Whether in 2003, Clayton, Sr. had a series of heart attacks and over the next few years continued to provide all over management and help with sales and customer service, but became less involved in day to day operations.

Whether from 2003 to 2007 CSA, NAPS, and CSI all worked together and prospered. WAMU was by far each company's largest customer, with HAC, CSA, and CSI performing and collecting for courier services in Houston, California and Florida, and Dallas, respectively.   The companies all worked together under the same name, with the same logos, and assisted each other to secure and promote business in their respective markets.

Whether from 2003 to 2007, CSI billed CSA for shirts with CSI logo on it for use in Florida and California, and billed CSA for insurance.

Whether from 2002 to 2008, CSI permitted CSA to use a variation of its name., and what was the understanding and agreement for use of the CSI name and trademark.

Whether from 2002 to 2008, CSI permitted CSA to use its minority status certification. and what was the understanding and agreement for such use.

Whether in 2006, Simpson left WAMU to pursue other opportunities.

Whether in February 26, 2007, CSI gave CSA written permission to use the name Courier Solutions of America, Inc. and what was the understanding and agreement for use of the CSI name and trademark.

Whether in early 2008, CSI and CSA lost their second largest customer, Bank of America, worth nearly $1,000,000 annually to each.

Whether prior to February of 2008, WAMU sent checks for courier operations performed in Dallas to CSI, checks for courier operations performed in Houston to HAC, and checks for courier operations performed in Florida and California to CSA.

Whether Plaintiff, Young, Loftis, or Williams acted fraudulently or with malice in tortiously interfering with Defendants' contracts with WAMU.   Whether   CSA   was incorporated for the purpose of conducting the business of courier services and delivery. and taking over the business of Courier Solutions of America, Inc.

Whether ACT was incorporated for the purpose of conducting the business of courier services and delivery and mail sorting and bidding for all new contracts and all renewals of contracts previously in HAC, CSA, and NAP's names.

Whether 2007, HAC did over $4,000,000.00 of business, CSA and NAPS, over $11,000,000.00 of business and CSI, over $3,000,000.00 of business.

Whether after February of 2008, WAMU sent checks for courier operations performed in Dallas to CSI, checks for courier operations performed in Houston to HAC, and checks for courier operations performed in Florida and California to CSA

Whether all S corporation federal income tax returns of CSI name Woodrow Clayton as a shareholder and use Clayton, Jr.'s taxpayer ID number, but such entries do not distinguish between Sr. or Jr.

Whether between March and December of 2008 Plaintiff, began corresponding with WAMU by letter, fax, and email, and twice flew out to WAMU's corporate offices on the west coast, once without an appointment, attempting to obtain information and requesting an

**JOINT PRETRIAL ORDER- Page 31**

investigation into which company owned the WAMU contracts in question, as well as into whether the contracts were obtained and/or maintained by improperly submitting minority certifications and/or by bribing WAMU officials.

Whether after a more than three month internal investigation WAMU determined CSA owned the WAMU contracts and that they had not been obtained by improperly submitting minority certifications and/or by bribing WAMU officials.

To the extent that some of the above-listed contested issues of fact are also issues of law, the same shall also be considered to be issues of law.

### D.  A LIST OF CONTESTED ISSUES OF LAW

Whether Clayton Sr. owed fiduciary duties to CSI, and breached such duties by diversion of corporate opportunities.

Whether CSI can meet its burden of proof as to its first count and claim of common law unfair competition, and whether one or more of one or more of the defendants defenses of statute of limitations, acquiescence, payment, license, waiver, laches and estoppel apply.

Whether Plaintiff is entitled to judgment against one or more of the Defendants, jointly and severally, for its actual and consequential damages caused by their alleged unfair competition, , breaches of fiduciary duty, and diversion of corporate opportunities..

Whether CSI can meet its burden of proof as to its second count and claim under the Texas Anti Dilution Act and whether one or more of one or more of the defendants defenses of statute of limitations, acquiescence, payment, license, waiver, laches and estoppel apply.

Whether Plaintiff is entitled to judgment against one or more of the Defendants, jointly and severally, for its actual and consequential damages caused by their violations of the Texas Anti-Dilution Act.

**JOINT PRETRIAL ORDER- Page 32**

Whether CSI can meet its burden of proof as to its third count under the Lanham Act for Unfair Competition, and whether one or more of one or more of the defendants defenses of statute of limitations, acquiescence, payment, license, waiver, laches and estoppel apply.

Whether CSI can meet its burden of proof as to its fourth count under the Lanham Act for Trademark Infringement, and whether one or more of one or more of the defendants defenses of statute of limitations, acquiescence, payment, license, waiver, laches and estoppel apply.

Whether Plaintiff is entitled to judgment against one or more of the Defendants, jointly and severally, for its actual and consequential damages caused by their alleged trademark infringement and whether one or more of one or more of the defendants defenses of statute of limitations, acquiescence, payment, license, waiver, laches and estoppel apply.

Whether CSI has an adequate remedy at law because its logo and mark is unique and represents to the public the identity, reputation and goodwill of Plaintiff's products and services, such that damages alone cannot fully compensate CSI for one or more of the Defendants' misconduct.

Whether unless enjoined by the Court, one or more of the Defendants will continue to engage in unfair competition by their unauthorized use and infringement of the CSI logo and mark to Plaintiff's irreparable injury.

Whether a threat of future injury to Plaintiff's business identity, goodwill and reputation requires injunctive relief to prevent one or more of the Defendants' continued unfair competition and to ameliorate and mitigate the injury to CSI.

Whether CSI has no adequate remedy at law because its registered logo and mark is unique to Plaintiff and represents its business identity, reputation and goodwill.

**JOINT PRETRIAL ORDER- Page 33**

Whether the damages caused by one or more of the Defendants' infringement are not susceptible to any precise calculation in that such damages involve lost business opportunities, loss of goodwill and lost profits, such that damages alone cannot fully compensate CSI for the one or more of the Defendants' infringement.

Whether unless enjoined by the Court, one or more of the Defendants will continue to use and infringe the registered CSI logo and mark to Plaintiff's irreparable injury. This threat of future injury to the business identity, goodwill and reputation of CSI requires injunctive relief to prevent one or more of the Defendants' continued use and infringement of Plaintiff's registered CSI logo and mark, and to ameliorate and mitigate Plaintiff's injury.

Whether CSI can meet its burden of proof as to its fifth count breach of alleged fiduciary duty, whether one or more of the defendants even had a duty to CSI, and whether one or more of one or more of the defendants defenses of statute of limitations, acquiescence, payment, license, waiver, laches and estoppel apply, and whether CSI had the resources to pursue corporate opportunities it believes one or more of the Defendants usurped..

Whether CSI can meet its burden of proof as to its sixth count for tortious interference with existing or prospective contracts and whether one or more of one or more of the defendants defenses of statute of limitations, acquiescence, payment, license, waiver, laches and estoppel apply.

Whether Defendants can meet their burden of proof as to their first count for breach of contract with respect to CSI's alleged sub contract with Defendants;

Whether Defendants are entitled to judgment against CSI, Young, Loftis, and/or Williams jointly and severally, for its actual and consequential damages caused by their breach of the sub contract.

Whether Defendants can meet their burden of proof as to their second count for conversion with respect to CSI's cashing of the $614,241.50 check.

Whether Defendants are entitled to judgment against CSI, Young, Loftis, and/or Williams jointly and severally, for its actual and consequential damages caused by their cashing of and refusal to return the parts of the check that did not belong to them.

Whether Defendants can meet their burden of proof as to their third count for CSI, Young, Loftis, and/or Williams' tortious interference with the Defendants' WAMU contracts, ultimately resulting in the loss of all of the contracts.

Whether Defendants are entitled to judgment against CSI, Young, Loftis, and/or Williams jointly and severally, for its actual and consequential damages caused by their tortious interference with the Defendants' WAMU contracts.

Whether Plaintiff, Third Party Defendants, or Defendants can claim exemplary damages.

Whether Plaintiff or Third Party Defendants can admit into evidence any part of a tape recording produced to Defendants on February 3, 2010.

Whether CSI should be allowed to present any evidence of damages not having not amended their disclosures during the discovery period.

To the extent that any of the above-listed issues of law are also issues of fact, the same shall also be considered issues of fact.

### E.     AN ESTIMATE OF THE LENGTH OF TRIAL

The parties estimate that the length of the trial will be four (4) days.

### F.     A LIST OF ANY ADDITIONAL MATTERS THAT MIGHT AID IN THE DISPOSITION OF THE CASE

SIGNED this ____ day of March, 2011.

DAVID C. GODBEY
UNITED STATES DISTRICT JUDGE

Law Offices of
LIPPE & ASSOCIATES


By:    /s/   Emil Lippe, Jr.
       Emil Lippe, Jr.
       State Bar No.  12398300
       Plaza of the Americas, South Tower
       600 N. Pearl Street, Suite S2460
       Dallas, Texas 75201
       Telephone:    214-855-1850
       Fax:          214-720-6074

       WEST & ASSOCIATES, L.L.P.
       Royce West
       State Bar No. 21206800
       Diana Laquey
       State Bar No. 21820720
       Derrell Coleman
       State Bar No. 04558550
       320 S. R.L. Thornton Freeway, Suite 300
       Dallas, Texas 75203
       Phone: 214-941-1881
       Fax:    214-941-1399

       ATTORNEYS FOR PLAINTIFF
       COURIER SOLUTIONS, INC.


       DANIEL J. HOFFMAN & ASSOCIATES


By:    /s/ Daniel J. Hoffman
       Daniel J. Hoffman
       State Bar No. 00785968

**JOINT PRETRIAL ORDER- Page 36**

Samantha Garbis Goss
State Bar No.24050637
314 Sawdust Road, Suite 205
The Woodlands, Texas 77380
Tel. 281-367-9550
Fax. 281-367-1944
Email: dan@dhoffman.com

Martha Hardwick Hofmeister
State Bar No. 08981500
Shackelford, Melton & McKinley, LLP
3333 Lee Parkway, Tenth Floor
Dallas, Texas 75219
Tel. 214-780-1400
Fax. 214-780-1401
Email: mhardwick@shacklaw.net

ATTORNEYS FOR DEFENDANTS
CSA DELIVERY, INC., d/b/a COURIER SOLUTIONS
OF AMERICA, INC., WOODROW CLAYTON, SR.,
WOODROW CLAYTON, JR., DARLENE CLAYTON,
ACTION COURIER & LOGISTICS, LLC, NORTH
AMERICAN PRESORT, INC., AND
HOUSTON AREA COURIERS, INC.